UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| **DIANA RICE,** *Administratrix of the Estate of Ronald Calvin Gaunce and  Next Friend of S.C.G.* | **CIVIL ACTION NO. 5:14-181-KKC** |
| **Plaintiff,** | |
| **v.** | **OPINION AND ORDER** |
| **MONTGOMERY COUNTY, KENTUCKY, et al.,** | |
| **Defendant.** | |

*** *** ***

This matter is before the Court on the motions for summary judgment (DE 42, 43) filed by the defendants.

This case arises out of the death of Ronald Gaunce, which occurred while Gaunce was in the custody of the Montgomery County Regional Jail. Gaunce was taken to the jail on Tuesday, March 19, 2013 after being arrested for trafficking in a controlled substance.  (DE 50-10, Admission Report.) Six days later, on Monday, March 25, Gaunce, who was 37 at the time, died. The coroner identified the cause of death as acute respiratory failure due to bilateral pulmonary thromboemboli, due to deep venous thrombosis of his left leg.  He identified "immobility from drug withdrawal" as a contributory cause. (DE 50-1, Autopsy Report; DE 49-3, Admission Rpt.)

Gaunce's mother, Diana Rice, filed this action against the county, certain jail personnel and certain medical providers at the jail alleging that they violated Gaunce's constitutional rights under the Eighth and Fourteenth Amendments. She also asserts state-law claims, including claims, for negligence, gross negligence, outrage, and wrongful death. Rice brings this action as administratrix of Gaunce's estate and on behalf of Gaunce's minor child.

All defendants now move for summary judgment.

## I. Background

At the time of his arrest, Gaunce was being treated by Dr. Oliver C. James for hip and back pain. (DE 49-5, Med. Rcds.) Dr. James's records reflect that he prescribed Gaunce daily doses of Opana, oxymorphone, and Neurontin. (DE 50-9, Med. Rcds. at CM-ECF pp. 11-12). At booking, Gaunce informed jail personnel that he was under a doctor's care, that he was on medication, and that he was subject to seizures. (DE 50-11, Standard Medical Questions.) When asked on a medical questionnaire if he had any other medical problems, Gaunce responded "yes bad shape." Gaunce tested positive for benzodiazepines, opiates, and oxycodone on the drug screen administered to him at the jail. (DE 45-2, Jones Dep. at 28.)

The county contracts with Southern Health Partners, Inc. (SHP) to provide medical services to inmates at the jail. (DE 43-4, Health Services Agreement.) SHP contracted with Dr. Ronald Waldridge to serve as the medical director of the jail. (DE 43-1, Mem. at 3; DE 44-4, Tipton Dep. at 52, 53.) He testified that he does not keep a record of the calls he receives from the jail. (DE 44-2, Waldridge Dep. at 20-21.) Nor does he keep records of his visits to the jail. (DE 44-2, Waldridge Dep. at 69.) When asked how often he visited the Montgomery County jail in the spring of 2013, Dr. Waldridge stated, "I don't keep a[n] accounting, and so it could have been – a typical rotation for me at that time would be a quarterly visit." (DE 44-2, Waldridge Dep. at 107.)

Defendant Patrina Tipton is a registered nurse employed by SHP. (DE 43-1, Mem. at 3.) She typically works at the Montgomery County jail 8:00 a.m. to 4:00 p.m. weekdays. (DE 44-4, Tipton Dep. at 46.) She works weekends if needed or to make up for an absence during the week. (DE 45-2, Jones Dep. at 56; DE 44-4, Tipton Dep. at 49-50.) Tipton testified that Dr. Waldridge typically sends a nurse practitioner – Jane Bartram – to conduct weekly visits at

the jail. (DE 44-4, Tipton Dep. at 54-55.) Because Bartram only visits the jail on Mondays, however, and because Gaunce did not spend a full Monday in the jail, Bartram never saw Gaunce. Tipton testified that she speaks with Dr. Waldridge "as the need arises." (DE 44-4, Tipton Dep. at 58.) Dr. Waldridge, Bartram, and Tipton are the only medical professionals who provide services at the jail. (DE 44-4, Tipton Dep. at 56.)

Tipton was working at the jail on Tuesday, March 19, the day that Gaunce was booked. Tipton testified that she knew Gaunce prior to his arrival at the jail and she knew he had injured his back while working at a factory. (DE 44-4, Tipton Dep. at 30.) She also knew that he took pain medications, including Opana. (DE 44-4, Tipton Dep. at 35.) Tipton noted in her progress notes for Gaunce on the 19th that he "has back injury all meds narcotic." (DE 50-12.)

Tipton testified that Gaunce informed her that his primary care physician was Dr. James Asher and that he was being treated by Dr. Oliver C. James for his back condition. (DE 44-4, Tipton Dep. at. 60-62.) She testified that Gaunce told her that he was on pain medicine that he took "on occasion." (DE 44-4, Tipton Dep. at 63.) Tipton understood that the pain medication was narcotics. (DE 44-4, Tipton Dep. at 63.) Tipton noted on the progress notes that she would fax a release of information request to both doctors and she testified that she recalled faxing the release to the doctors that day. (DE 50-12; DE 44-4, Tipton Dep. at 64.)

Tipton testified that she faxed the release in order to obtain the doctors' diagnoses and "anything that would be needed for continuity of care." (DE 44-4, Tipton Dep. at 61-62.) However, Tipton testified that she does not recall receiving any response from either doctor. (DE 44-4, Tipton Dep. at 61-62.) She did not make any further attempt to contact either of the doctors about Gaunce. (DE 44-4, Tipton Dep. at 64.) Tipton testified that an inmate on narcotics could continue to receive narcotics while incarcerated at the jail and that Dr.

3

Waldridge made the decision on whether the inmate should be administered narcotics in the jail. (DE 44-4, Tipton Dep. at 65.)

Tipton testified that, at the time of booking, there was nothing unusual about Gaunce's appearance or behavior. (DE 44-4, Tipton Dep. at 60.)  She began a flow chart to monitor him for symptoms of drug withdrawal. (DE 50-13, Flow Chart.) She testified that she began the chart because Gaunce stated he was taking narcotic medication and it was protocol to begin the chart for all inmates on narcotics. (DE 44-4, Tipton Dep. at 83.) On the day he was booked, Tipton did not note any symptoms of drug withdrawal – no weakness, restlessness, sweating, shakiness, anxiety, ataxia (incoordination), drowsiness, vomiting, nausea, nystagmus (rapid eye movement), confusion, or slurred speech. (DE 50-13, Flow Chart).

The following day – Wednesday, March 20, 2013 – Tipton noted on the flow chart that Gaunce had slight restlessness and that he stated he had anxiety. (DE 50-13, Flow Chart). Tipton did not complete the chart for Thursday, March 21. On Friday, March 22, however, Sergeant Seth Newsome noted in an incident report that Gaunce was "unstable on his feet" when he came out of his cell to retrieve his breakfast tray. (DE 50-15, Incident Rpt.) Sgt. Newsome and Deputy Jailer Avon Garrison questioned Gaunce who told them he was "detoxifying." (DE 50-15, Incident Rpt.) Deputy Garrision testified that he "vividly" remembered Gaunce telling Sgt. Newsome that he was detoxifying. (DE 45-3, Garrison Dep. at 22.)

Deputy Garrison testified that Gaunce tripped and was "extremely slow" going back up the stairs after retrieving his breakfast tray. (DE 45-3, Garrison Dep. at 19.) Deputy Jerry Schultz worked the control tower at the jail. In that position, he viewed monitors displaying events captured by the jail's cameras. (DE 45-4, Schultz Dep. at 11.) Schultz testified that he observed Gaunce fall as he was going up the stairs. (DE 45-4, Schultz Dep. at 46.)

4

At that time, Gaunce was in a cell with somewhere between 10 and 17 inmates. (DE 45-3, Garrison Dep. at 19-20.) Deputy Garrison and Sgt. Newsome decided to move Gaunce to a single-inmate observation cell (Cell No. 139). (DE 45-3, Garrison Dep. at 22-23, 24-25; DE DE 50-15, Incident Rpt.) Deputy Garrision testified that it was his expectation that Gaunce would be seen by a nurse after he was moved to Cell 139 but Garrison did not personally speak with a nurse about Gaunce. (DE 45-3, Garrison Dep. at 27.)

Tipton noted in her progress notes for Friday, March 22 that she had been informed that Gaunce had been found that morning with feces on himself. Deputy Garrison, however, testified that, when retrieving his breakfast tray, Gaunce did not appear to have urinated or defecated on himself. (DE 45-3, Garrison Dep. at 21.) Tipton could not remember who informed her that Gaunce had feces on himself. (DE 44-4, Tipton Dep. at 76.) Tipton testified that, after being informed of Gaunce's condition, she directed that he be brought to the medical clinic at the jail. (DE 44-4, Tipton Dep. at 78.)

Tipton testified that she called Dr. Waldridge and explained Gaunce's symptoms, the fact that Gaunce had been found with feces on himself, and that he had a back condition and took narcotics pursuant to a prescription. (DE 44-4, Tipton Dep. at 99.) Dr. Waldridge told Tipton to "start the detox protocol." (DE 44-4, Tipton Dep. at 100; DE 50-12, Progress Notes.)

In Gaunce's case, that protocol consisted of Phenobarbital, Dilantin, Phenergan, and Imodium. (DE 50-16, Order.) Dr. Waldridge testified that Phenobarbital is prescribed to prevent agitation, irritability, and shakiness and because it lowers the risk of seizures. (DE 44-2, Waldridge Dep. at 31-32.) Dilantin is prescribed for seizures and withdrawal. (DE 44-2, Waldridge Dep. at 33.) Dr. Waldridge testified that there is sometimes "GI distress" when an individual detoxes from opiate medications. (DE 44-2, Waldridge Dep. at 34.) Phenergan is prescribed to treat nausea and vomiting and Imodium is prescribed to treat diarrhea. (DE 44-2, Waldridge Dep. at 34.)

5

Tipton testified that, at that time, Gaunce's "vitals were within normal limits" but he "had a tremor in his hands." (DE 44-4, Tipton Dep. at 78.) She testified that, when taking the medications, he had a "hard time drinking" because "the glass shook." (DE 50-12, Progress Notes; DE 44-4, Tipton Dep. at 77-78, 80.) Tipton noted on the withdrawal flow chart for Friday that Gaunce was experiencing weakness, some shakiness, ataxia, drowsiness, confusion, and slurred speech. (DE 50-13, Flow Chart.)

Tipton did not usually work on the weekends. (DE 44-4, Tipton Dep. at 47-50.) At approximately 10:00 Friday evening (March 22), deputy jailers went to Gaunce's cell to administer the prescribed medications and found Gaunce breathing but unresponsive and lying in his own urine. (DE 50-17, Report.) He was unable to take his medication. (DE 50-17, Report.)

Deputy Jailer Michael Gabbard called Tipton who directed that Gaunce be taken to the hospital. (DE 50-17, Report.) The hospital's records indicate that Gaunce's "chief complaint" was a seizure witnessed by a deputy. The records state that the "deputy went into pt's cell to give his meds ('Detox pill') and he was 'out of it.' States started shaking all over for. . . 15-20 mins . . . Seizure, per Deputy. Reports pt. detoxing from opiates, oxy & benzo past 2-3 days." (DE 43-15, Records.) Despite the medical records, no deputy deposed in this action remembers witnessing Gaunce having a seizure that evening.

Gaunce was treated at the hospital and was discharged the following morning – Saturday, March 23, 2013 – at 4:00 a.m. His discharge instructions state the diagnosis as "probable seizure at the jail." (DE 50-18, Discharge Instructions.) The instructions caution that "the patient has a sublevel phenobarbital level of 2.0; therapeutic level is 15-40; if he is taking this phenobarbital for seizures, the dosage need[s] to be increased." (DE 50-18, Discharge Instructions.) Tipton testified that she would have called Dr. Waldridge on March

23 to inform him that Gaunce had been taken to the hospital. She testified that this is her practice. (DE 44-4, Tipton Dep. at 67-68.)

Deputy Gabbard testified that, after Gaunce was returned to the jail, he was moved to an observation cell (Cell 138).  (DE 45-7, Gabbard Dep. at 18.) An inmate is moved to cell 138 as his condition worsens because there is a camera in cell 138 which permits constant observation. (DE 45-3, Garrison Dep. at 25-26.) Gabbard drafted an incident report describing the events and stating that "Gaunce is to remain on 20 minute checks" and that he was not to be removed from the observation cell until he was cleared by Nurse Tipton. (DE 50-17, Incident Rpt.) Gabbard noted that a copy of Gaunce's discharge instructions and the incident report would be placed in Tipton's mailbox at the jail. (DE 50-17, Incident Rpt.)

Tipton visited the jail on Saturday, March 23rd. (DE 44-4, Tipton Dep. at 150-51.) She noted on the flow chart for alcohol/drug withdrawal that, on Saturday, Gaunce was still experiencing weakness, restlessness, shakiness/muscle twitching, ataxia, drowsiness, confusion, and slurred speech and that, in addition, he was now experiencing restlessness. (DE 50-13, Flow Chart.)

Tipton testified that Gaunce received Phenobarbital the morning and evening of Saturday, March 23. (DE 44-4, Tipton Dep. at 186.) Eric Jones, the jailer of the Montgomery County Regional Jail, testified that at about 11:00 on Saturday morning, he noticed Tipton speaking with Gaunce. He testified:

> At that time, I went over. He was sitting up and she was talking to him. And then I asked him, I said, "Ronnie, are you okay?" and he said, "Yes, sir." I said, "Are you sure?" and he goes, "Yeah, I'm just tired." And I said, "But does everything else feel okay? Do you feel all right?" and he said, "Yes, sir. I'm just tired." He said it twice.

(DE 45-2, Jones Dep. at 41.)

Tipton testified that she told Jones "what was going on with Mr. Gaunce, and that he had been sent to the hospital and returned to us." (DE 44-4, Tipton Dep. at 152.) She testified

7

that she informed Jones that Gaunce's vital signs were normal but that "should he worsen in condition, if they see any different anything that they are to contact me, or to call 911 immediately if that be necessary." (DE 44-4, Tipton Dep. at 152, 153.) She testified that this was her last conversation with anyone at the jail before she learned of Gaunce's death. (DE 44-4, Tipton Dep. at 181.)

There was no medical professional at the jail on Sunday, March 24. (DE 44-4, Tipton Dep. at 183.) Gaunce did not take Phenobarbital that morning but did take it in the evening. (DE 44-4, Tipton Dep. at 186.)

Deputy Garrison reported to work at midnight on Monday, March 25. (DE 45-3, Garrison Dep. at 16-17, 34.) He was instructed to "keep an extra eye" on Gaunce, though no one told him any particular signs or symptoms that that should alert him or gave him any more specific instructions. (DE 45-3, Garrison Dep. at 16-17.) Garrison testified that, when he received such instructions, he typically reviewed the inmate's medical questionnaire and that is how he would have discovered that Gaunce had a history of seizures. (DE 45-3, Garrison Dep. at 16-17, 31-32.) Garrison said he performed "his normal 15 to 20 minutes checks, making sure we open the cell door and actually talk to Mr. Gaunce, and get some sort of a response from him." (DE 45-3, Garrison Dep. at 17.) He testified that this was "[n]othing really any different" than he did for other inmates in detox cells. (DE 45-3, Garrison Dep. at 18.)

At or about 2:44, Garrison opened Gaunce's cell door. Gaunce was lying on the bed mat and Garrison determined that Gaunce had urinated and defecated on himself. (DE 45-3, Garrison Dep. at 38, 44; DE 50-21, Incident Rpt.; DE 49-13, Police Rpt.) He asked Gaunce if he was okay, and Gaunce responded, "yes." (DE 45-3, Garrison Dep. at 39.) Garrison offered to help Gaunce clean himself up. Garrison testified that "it's kind of embarrassing anyway so I tried not to, you know, make him feel uncomfortable." (DE 45-3, Garrison Dep. at 41.)

8

Garrison testified that Gaunce needed help to stand up and so he and Deputy Larry Oakley transported Gaunce to the shower in a restraint chair. (DE 45-3, Garrison Dep. at 42.) Schultz testified that he observed Gaunce on the control room monitors in the early morning hours of Monday March 25 and that "he was so weak he couldn't stand up, and the guards had the door open and holding him so he wouldn't fall." (DE 45-4, Schultz Dep. at 43.) Deputy Schultz testified that the deputies told him that Gaunce had urinated and defecated on himself. (DE 45-4, Schultz Dep. at 50.)

After wheeling Gaunce into the shower in the restraint chair, the deputies undressed Gaunce and placed him in another chair located in the shower. (DE 50-21, Incident Rpt.; DE 45-3, Garrison Dep. at 54.) Gaunce was able to converse with the deputies at this time. (DE 45-3, Garrison Dep. at 55.) He apologized that the deputies had to help him undress. (DE 45-3, Garrison Dep. at 54.) He leaned forward and raised his feet to help the deputies undress him. (DE 45-3, Garrison Dep. at 54.) He explained to them that a tattoo on his arm was an image of his son. At that point, everything seemed normal to Garrison. (DE 45-3, Garrison Dep. at 55.)

Deputy Garrison warmed the water and tested it before the deputies moved Gaunce from the restraint chair to a chair they placed under the shower so Gaunce would not have to stand. (DE 45-3, Garrison Dep. at 56.) After 20 to 30 seconds, however, Gaunce "started to have seizure like symptoms." (DE 45-3, Garrison Dep. at 57; DE 50-21, Incident Rpt.) He was "shaking and convulsing, also urinating all over shower area while in chair." (DE 50-21, Incident Rpt.) Garrision and Oakley picked Gaunce up and moved him to a flat area. (DE 45-3, Garrison Dep. at 59.)

At about 2:53 a.m., Deputy Garrison called his supervisor, Lieutenant Justin Crockett, at home to inform him of Gaunce's condition. (DE 45-3, Garrison Dep. at 62.) Gaunce was not breathing at this time but did have a pulse. Deputy Garrison then did a "finger sweep" of

Gaunce's airway but found nothing blocking it. At about 3:00 a.m., Crocket told Garrison to call for an ambulance and Garrison called the control tower and instructed officers there to call for an ambulance. (DE 50-21, Incident Report)

When asked why he did not call an ambulance immediately after Gaunce displayed seizure-like symptoms, Garrison testified, "There's people that have seizures and then we typically wind up transporting them to the hospital at that time. But since he wasn't breathing at the time it was – I had to take care of him." (DE45-3, Garrison Dep. at 67.)

Garrison instructed Deputy Oakley to support Gaunce's head while Garrison began "rescue breathing." Garrison did two rounds of rescue breathing and then felt for a pulse but was unable to find one. Garrison began compressions and continued to perform CPR until the EMT arrived. At approximately 3:22 a.m., Gaunce was taken by ambulance to the hospital. Garrison told Deputy Oakley to follow the ambulance and to stay with Gaunce until further notice. (DE 50-21, Incident Rpt.)  At approximately 3:47 a.m., Gaunce was pronounced dead. (DE 50-1, Autopsy Rpt.)

## II. Analysis

### A. Constitutional claims

 "The Eighth Amendment's protections against cruel and unusual punishment extend to pretrial detainees through the Fourteenth Amendment's Due Process Clause and thus claims by pretrial detainees challenging conditions of confinement are analyzed under the Eighth Amendment." *Brodak v. Nichols*, No. 97-1688, 1998 WL 553032 at *1 (6th Cir. 1998). "The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir.2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

10

A viable Eighth Amendment claim has objective and subjective components. *Id.* "The objective component requires a plaintiff to show the existence of a 'sufficiently serious' medical need." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective component "requires that the defendant act with deliberate indifference to an inmate's health or safety." *Green v. Martin*, 18 F. App'x 298, 300 (6th Cir. 2001).

### 1) Constitutional claim against the individual jail personnel

Rice has asserted an Eighth Amendment claim against five individuals who were employed by the jail at the time of Gaunce's death:  Jailer Jones, Lt. Crockett, and Deputies Garrison, Schultz and Oakley.

Rice agrees that her claim against Lt. Crockett should be dismissed. (DE 49, Response at 22.) The Court has already dismissed the claims against Deputy Oakley because Rice did not serve him as required under Federal Rule of Civil Procedure 4(m). (DE 21, Order.) That leaves Jailer Jones, and Deputies Garrison and Schultz. These defendants concede that there is sufficient evidence to create an issue of fact as to the objective component of Rice's Eighth Amendment claim – that Gaunce had a serious medical need.  To the extent that any of the defendants dispute this, Rice has cited sufficient evidence on the objective component to withstand summary judgment. She has presented evidence that Gaunce was detoxifying from prescription narcotics, unsteady, and shaking, unable to control his bodily functions, that he was found unresponsive and lying in his own urine at one point, and that he had a 15-20 minute seizure. This is sufficient evidence to withstand summary judgment on the issue of whether Gaunce had a serious medical need.

The jail personnel focus their argument on the subjective component. They argue that there is no evidence from which a jury could find that they acted with deliberate indifference to Gaunce's need.

11

"Deliberate indifference is not mere negligence; instead, it requires that the officers 'knew of and disregarded a substantial risk of serious harm to [an inmate's] health and safety.'" *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (citation omitted). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citation omitted). "If the officers failed to act in the face of an obvious risk of which they should have known but did not, then they did not violate the Fourteenth Amendment." *Id.* "The subjective component is intended to prevent the constitutionalization of medical malpractice claims." *Reed v. Speck*, 508 F. App'x 415, 419 (6th Cir. 2012) (citation omitted). While deliberate indifference is more than negligence, "it is satisfied by something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Farmer*, 511 U.S. at 835.

"This is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Garretson*, 407 F.3d at 795 (quotations and citation omitted). "The subjective component must be addressed for each officer individually." *Id.* at 797. This is equivalent to a "reckless" standard. *Farmer*, 511 U.S. at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

The issue on the subjective prong is whether there is evidence that these individual defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm to Gaunce existed, that each defendant drew that inference, and that each then disregarded the risk.

12

By Friday morning, March 22, Garrison was aware that Gaunce was detoxifying. He testified that he "vividly" remembered Gaunce stating that he was detoxifying that day and Garrison observed Gaunce trip and move extremely slow that morning. This was Garrison's first interaction with Gaunce and his first indication that Gaunce may require medical care. (DE 45-3, Garrison Dep. at 26-27.)

Garrison did, however, take some action in response to learning that Gaunce was detoxing. That morning, Garrison and Sgt. Newsome moved Gaunce to a single-inmate observation cell. Deputy Garrison testified that he expected that Gaunce would receive medical care there and that the officers moved him there "so he could be seen by the nurse." (DE 45-3, Garrison Dep. at 24, 27.) Although Garrison did not personally speak with Nurse Tipton, she testified that she did see Gaunce that day, called Dr. Waldridge, and, pursuant to Dr. Waldridge's instructions, began the detox protocol. Accordingly, no juror could find that Garrison's decision to move Gaunce to an observation cell in response to his medical need was deliberately indifferent.

Rice does not appear to argue, however, that Garrison acted with deliberate indifference on Friday.  Instead, she argues that he and Deputy Schultz acted with deliberate indifference on Monday morning. (DE 49, Reponse at 23.) She argues that both officers "knew [Gaunce] was going through detox, and both believed on Monday morning that his condition had obviously deteriorated since they saw him last. But neither did anything other than continue to watch him.  When [Gaunce] was found immobile and covered in urine and feces on Monday morning, instead of following the Jail's EMS policy, they took him to the shower with fatal results." (DE 49, Reponse at 23.)

Both Garrison and Schultz reported for work on Monday at midnight. Deputy Schultz called for an ambulance for Gaunce at about 3:00 a.m. Thus, it is somewhere in this three-hour time span that Rice argues the deputies responded to Gaunce's medical needs with

deliberate indifference. Deputy Garrision testified, however, that during this time frame, he entered Gaunce's cell every 15 to 20 minutes and ensured that Gaunce was able to respond to him. There is no evidence that he was instructed to monitor Gaunce any more closely or take any other actions during this time frame. Nor is there any evidence that Garrison was subjectively aware that these actions were insufficient to monitor the risks posed to Gaunce's health.

The first sign that Gaunce was in need of medical care that morning occurred at 2:44 a.m., when Deputies Garrison and Oakley discovered that Gaunce had been unable to control his bodily functions and was unable to stand up. Perhaps they should have called for an ambulance immediately instead of 15 minutes later but Rice presents no evidence that is the case. *See Garretson*, 407 F.3d at 797 ("[A]n incarcerated plaintiff who complaints that a delay in medical treatment violates her constitutional rights must present 'verifying medical evidence' to establish the detrimental effect of the delay.")

Further, even if Garrison should have called for medical help immediately upon discovering Gaunce at 2:44 a.m., any delay in doing so "cannot be said to show that he knew of and disregarded a substantial risk of serious harm" to Gaunce's safety. *Id*. (citation and internal quotations omitted). At that point, Gaunce was able to converse with the deputies. There is no evidence that Garrison was aware that Gaunce needed immediate medical care at that point. Thus, it was not deliberately indifferent for Garrison to take Gaunce to the shower to clean him up.

Rice points out that the jail's Emergency Medical Services (EMS) Policy requires that the officers confronted with an emergency:

> a.  immediately administer first aid;
> b.  Call the Facility Physician in accordance with the Medical Emergency Care Plan {NEXT PAGE} and relay the emergency information. All numbers for the Facility Physician and other

14

                    medical emergency personnel are posted in the Montgomery
                    County Regional Jail Booking Area;

    c.      Contact E.M.S.

    d.      Notify the Montgomery County Jailer.

(DE 49-6, EMS Policy.)

The policy defines an emergency to include "drug or alcohol withdrawal." (DE 49-6, EMS Policy.) While the alleged violation of jail policy may be a relevant factor in determining whether the deputies acted with deliberate indifference, a juror could not find a constitutional violation based solely on such a violation. Further, there is no evidence that any of the deputies observing Gaunce at this time were aware that his inability to control his bodily functions was a sign of drug withdrawal requiring immediate medical care.

Garrison did immediately begin medical care after Gaunce exhibited more serious "seizure-like" symptoms in the shower. At that point, he moved Gaunce to a flat area, called his supervisor, attempted to clear Gaunce's airway, called for an ambulance, and began CPR. By 3:22, Gaunce was taken by ambulance to a hospital.  These actions cannot be found to constitute reckless indifference to Gaunce's health or safety. Ultimately, Rice's complaint with Deputy Garrison's actions appears to be that he should have performed some of the actions sooner than he did.  Any such errors "are insufficient to establish liability for deliberate indifference" unless Rice can point to evidence that Deputy Garrison "knew there was an earlier risk and disregarded it with the knowledge that it would cause harm" to Gaunce. *Reed*, 508 F. App'x at 421. Rice cites no such evidence.

Nor is there evidence that Deputy Schultz recklessly disregarded Gaunce's need for medical care on Monday morning. Schultz testified that he could not recall ever speaking with Gaunce (DE 45-4, Schultz Dep. at 39). He was, however, aware that Gaunce was detoxing. (DE 45-4, Schultz Dep. at 19.) Schultz testified that he left the jail at the end of his

shift on Friday at 8:00 a.m. and did not hear anything about Gaunce's condition until he reported for his next shift at midnight on Monday. (DE 45-4, Schultz Dep. at 30, 48.)

Schultz testified that he went directly to the control room when he came in for his shift on Monday. (DE 45-4, Schultz Dep. at 30.) At some point, he learned that Gaunce had been transported to the hospital during the weekend. He was not certain when he learned that information. (DE 45-4, Schultz Dep. at 51-52.) There is no evidence, however, that Schultz received any instructions regarding how Gaunce should be monitored or that he should call for medical care upon the appearance of certain symptoms.

Schultz testified that the first time he looked at the monitor displaying Gaunce's cell, that Gaunce was lying down. (DE 45-4, Schultz Dep. at 48.) Deputies Garrison and Oakley later called Schultz to tell him they were going to take Gaunce to the shower because he had urinated and defecated on himself. (DE 45-4, Schultz Dep. at 48.) There is no evidence that Schultz was subjectively aware that Gaunce's symptoms at this point indicated a need for immediate medical care.

Schultz was not able to see in the shower because there are no cameras in there. (DE 45-4, Schultz Dep. at 61.) Thus, he would not have seen the seizure-like activity. Schultz testified that he heard Deputy Garrison yell for help and say that he was starting CPR.  (DE 45-4, Schultz Dep. at 62.) It was Deputy Schultz who called 911. (DE 45-4, Schultz Dep. at 61.)

Rice does not explain exactly what Schultz did or failed to do that constituted deliberate indifference. Perhaps Schultz also should have called for medical help earlier than he did. There is no evidence, however, that Schultz was aware of the need for immediate medical care any earlier than when he placed the 911 call.

As to Jailer Jones, the county jailer has the "custody, rule and charge of the jail in his county and of all persons in the jail. . . ." KRS 71.020. Rice points out that Tipton testified

16

that she informed Jones on Saturday that Gaunce had been to the hospital and that she instructed Jones to call her or 911 immediately if Gaunce's condition should worsen. While Jones disputes that he received these instructions, a juror could believe Tipton's testimony on this issue. Likewise, a juror could find that Jones' failure to pass these instructions on to his deputies constituted deliberate indifference to Gaunce's serious medical needs.

Jailer Jones argues that he is entitled to qualified immunity, which shields government officials performing discretionary functions from liability under Section 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Phillips*, 534 F.3d at 538 (citation omitted). An official is not entitled to qualified immunity if the facts alleged by the plaintiff establish a prima facie case of a constitutional violation and the right was clearly established at the time of the violation. *Id*. at 539.

As discussed, Rice has presented sufficient evidence to withstand summary judgment that Jones was deliberately indifferent to Gaunce's medical needs. As to whether that right was clearly established at the time of the violation, the Sixth Circuit explicitly held in 1992 "that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Id*. at 545 (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 545 (6th Cir. 2005)).

For all these reasons, the constitutional claim against Deputies Schultz and Garrison will be dismissed but the claim against Jailer Jones will remain.

### 2) Constitutional claim against Nurse Tipton and Dr. Waldridge

In addition to the jail personnel, Rice also asserts Eighth Amendment claims against Nurse Tipton and Dr. Waldridge in their individual capacities.

Dr. Waldridge asserts that the constitutional claim against him must be dismissed because he was not acting "under color of state law" as required for a § 1983 claim. *See Jones*

17

*v. Duncan*, 840 F.2d 359, 361-62 (6th Cir. 1988). In determining whether a private individual should be considered a state actor, the Sixth Circuit employs three tests: the public-function test, the state-compulsion test, and the nexus test. *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014). Rice argues that Dr. Waldridge is a state actor under the public-function test. That test "requires that the private [individual] exercise powers which are traditionally exclusively reserved to the state." *Id.* (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir.1992)).

The Sixth Circuit has recognized "the basic premise that states must provide medical care to those in custody." *Id*. Dr. Waldridge does not dispute that he agreed to provide medical care to inmates for the county but argues that the county did not personally contract with him to provide medical services at the Montgomery County jail. Instead, the county contracted with SHP, who then contracted with Dr. Waldridge. Faced with the same argument in *Muskegon Cty.*, the Sixth Circuit held, "[w]hether [the doctor] was employed directly by the state does not control whether she was a state actor." *Id*. This is because "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *West v. Atkins*, 487 U.S. 42, 55-56 (1988). Because providing medical care to pretrial detainees is a power that has traditionally been reserved to the state, Dr. Waldridge is a state actor for purposes of § 1983. *Muskegon Cty.*, 763 F.3d at 597.

Though Dr. Waldridge does not remember receiving a phone call from Nurse Tipton on March 22, Tipton testified that she did call him that date to inform him that deputies had found Gaunce with feces on himself and that Gaunce was having "difficulties." (DE44-4, Tipton Dep. 66, 69, 75.) Likewise, though Dr. Waldridge does not remember it, a reasonable juror could believe Tipton's testimony that she called Dr. Waldridge again on March 23 to

18

inform him that Gaunce had been hospitalized after having been found unresponsive and lying in his own urine. In fact, in their motion, the defendants assert that Nurse Tipton did, in fact, call Dr. Waldridge on the 23rd "to update him regarding Mr. Gaunce's trip to the ER and current condition." (DE 43-1, Mem. at 13.) At this time, Gaunce displayed signs of a serious medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897.

SHP policy J-D-05[1] requires the nurse and Medical Director to "review all discharge orders, summaries, relevant lab and lab test results for the patient and perform follow up care as needed." (DE 50, Response at 19.) Dr. Waldridge testified that generally if he were contacted by a nurse at the jail about an inmate who had been transported to the emergency room he would request not only the discharge instructions but "the full record of their ER visit, the labs that were done, the findings of those labs, and the recommendations of the treating physician." (DE 44-2, Waldridge Dep. at 90.) Dr. Waldridge also testified that, if he had been informed by a nurse that Gaunce had been found unresponsive and incontinent on Saturday, March 23, he "would like to have seen a[n] evaluation on the 24th." (DE 44-2, Waldridge Dep. at 99.)

There is no dispute that Dr. Waldridge did not ask for the discharge instructions from the hospital or follow up with hospital personnel. There is no dispute that Dr. Waldridge did not evaluate Gaunce's condition on Sunday or see to it that another medical professional did. A reasonable juror could find that this constitutes deliberate indifference to Gaunce's serious medical need. This is not a situation where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment." *Graham ex. rel. Estate of Graham v.*

---

[1] Rice quotes SHP policies throughout her briefs. The Court has been unable to locate the policies in the record. Nevertheless, the defendants have not objected to Rice's characterization of the policies. Accordingly, for purposes of this motion , the Court has assumed that Rice has accurately quoted the policies.

*County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004). Instead, there is evidence in this case that Dr. Waldridge rendered no medical attention to Gaunce at all after receiving information that he had a serious medical need.

As to the claim against Nurse Tipton, the evidence shows that she was aware at the time that Gaunce was booked that he was on narcotics but she did not follow through with his treating physician to obtain information regarding the kinds of narcotics or the dosage he was prescribed. SHP policy J-E-12 provides that "Upon an inmate patient's admission into the jail every effort must be made in obtaining information concerning previous and/or current treatment plans." (DE 50, Response at 12.) It further provides, "In some cases based on certain situations it may be prudent to keep patient on a medication until records are received and reviewed by the physician/physician provider." (DE 50, Responses at 12.) SHP policy J-D-02 provides that "If medication cannot be verified or the patient was not taking the medication consistently prior to incarceration then the patient must be reviewed by the Medical Director to determine if the course of treatment is to continue." (DE 50, Response at 13.)

The SHP policy on treating patients experiencing drug withdrawal (SHP policy J-G-06) provides as follows:

> Detoxification will be carried out only under medical supervision and initiated by the medical staff with physician overview on an individual care basis. All detainees found to be demonstrating the signs and symptoms of drug/alcohol withdrawal will either be seen or reviewed by the Medical Director and his ordered care treatment plan will be followed. Inmate patients experiencing severe, life threatening … withdrawal must be seen by the Medical Director and upon his orders may be transferred to a licensed acute care facility, or the local emergency room for treatment. In life-threatening situations, immediately have the patient sent to the local ER for treatment.
>
> Detox inmate patients must be monitored on a consistent basis and all findings charted in his/her medical record. Documentation of the patient's status during detoxification is very important and must be reviewed by all medical staff members when needed in order to

20

> maintain patient care while incarcerated. Use the Alcohol and Drug Detox Flow Sheet.
>
> Correctional officers must be made aware of inmate patients placed on a detox program so they too will be able to monitor the patient for signs and symptoms of withdrawal distress.

(DE 50, Response at 14.)

Tipton did not call Dr. Waldridge until March 22 at the earliest.  As discussed, there is a dispute as to whether she directed any jail personnel to monitor Gaunce's signs and symptoms. Tipton did begin monitoring Gaunce for signs and symptoms of withdrawal on Tuesday, the day that he was booked. However, by Wednesday, Gaunce was showing some signs of narcotics withdrawal and there is no evidence that she did anything in response. The Flow Chart for Alcohol/Drug Withdrawal directs Tipton to "[r]eport all findings to your Medical Director. Medical Director must review and sign form at next Physician Sick Call. If patient experiences changes or deterioration is noted, notify your Physician immediately for further orders." (DE 50-13, Flow Chart.) SHP's treatment guidelines for alcohol/drug withdrawal require that for mild to moderate withdrawal symptoms, the nurse is to obtain vital signs at least twice a shift, monitor the patient's fluid and food intake and push fluid intake, and monitor for progressive withdrawal symptoms. (DE 50-14, Guidelines.)

Tipton did not obtain Gaunce's vital signs twice each shift or evaluate his fluid and food intake. She did not evaluate Gaunce on Thursday at all.  She stated in her deposition that the only reason she could think of was that "there was no officer available to bring him to me." (DE 44-4, Tipton Dep. at 94.) A juror could find that Tipton's failure to monitor Gaunce more closely constituted deliberate indifference to his medical needs.

Tipton did examine Gaunce on Friday morning after she was alerted by the deputies that he was exhibiting more serious signs of withdrawal. She called Dr. Waldridge that same day and, pursuant to his instructions, began the detox protocol. Tipton left the jail on Friday and

was not scheduled to work the weekend. She was aware at this time that Gaunce was in an observation cell where deputies would check on him every 15 to 20 minutes. She cites no evidence, however, that she instructed deputies as to the symptoms of serious drug withdrawal.

Friday evening, when the officers observed signs of a serious medical need, they called Tipton who instructed the deputies to take Gaunce to the emergency room. Upon his release from the hospital, however, there is no evidence that Tipton reviewed the hospital's discharge instructions. She asserts that she never received them but there is no evidence that she asked for them or followed up with the hospital in any manner. A jury could find that this constituted deliberate indifference to Gaunce's medical needs. SHP's treatment guidelines for severe withdrawal symptoms require that an inmate's vital signs be taken every two hours. (DE 5-14, Guidelines.) Tipton took Gaunce's vital signs only once on Saturday and not at all on Sunday.

Tipton asserts that she told Jailer Jones on Saturday to call her or 911 if necessary if Gaunce's medical condition should worsen. Jailer Jones denies that Tipton gave him these instructions. If Tipton did not, a juror could find that she was deliberately indifferent. Likewise, a juror could find that Tipton was deliberately indifferent to Gaunce's medical needs by failing to inform jail personnel of specific signs that would indicate that Gaunce was experiencing serious withdrawal distress.

While a finding of deliberate indifference cannot be based solely on a violation of company policy, a reasonable juror could find that Dr. Waldridge and Nurse Tipton were deliberately indifferent to Gaunce's medical needs regardless of whether their actions violated any of SHP's policies.

Rice asserts that Dr. Waldridge should also be liable for a failure to train Nurse Tipton. "Supervisory liability under § 1983 cannot attach where the allegation of liability is based

22

upon a mere failure to act." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). To succeed on a failure to train or supervise claim against an individual supervisor, a plaintiff must show that the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Comstock v. McCrary*, 273 F.3d 693, 712–13 (6th Cir.2001). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips.*, 534 F.3d at 543. Rice points to no such evidence. Accordingly, Dr. Waldridge cannot be held liable under a failure-to-train theory.

For all these reasons, the Eighth Amendment claim against Tipton and Dr. Waldridge will not be dismissed on this motion for summary judgment. The Court cautions, however, that, in order to be entitled to damages, Rice must prove not only that these defendants were deliberately indifferent to Gaunce's medical needs but also that any such deliberate indifference caused Gaunce's injuries. Causation evidence is not discussed or cited in the briefs currently before the Court. Accordingly, the Court will not address in this opinion whether sufficient causation evidence exists to support Rice's § 1983 claim.

### 3) Constitutional claim against SHP

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Court held that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under § 1983." *Id.* at 389. In *Canton*, the court recognized that "[i]t may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to their need." *Id*. at 390.

Because SHP performs the traditional state function of providing medical services to inmates, it "stands in the shoes of" Montgomery County for purposes of § 1983 liability. *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 737 (6th Cir. 2015). Thus, "SHP's failure to train and supervise its [staff] adequately about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983 and constitute the moving force behind [Gaunce's] harm." *Id*. (citation and quotations omitted).

For this claim, Rice must present evidence that SHP's failure to train and supervise its medical professionals "about the legal duty to provide constitutionally adequate medical care amounted 'to deliberate indifference to the rights of persons with whom the [medical professionals] come into contact.'" *Shadrick*, 805 F.3d at 737 (quoting *City of Canton*, 489 U.S. at 388). SHP cannot be found liable under theories of vicarious liability or respondeat superior. *Id*

Rice can demonstrate deliberate indifference for purposes of a failure-to-train claim in one of two ways. First, she can show "a pattern of similar constitutional violations by untrained employees and SHP's continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees." *Id*. at 738-39 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal brackets and quotations omitted)). Second, Rice can establish "a single violation of federal rights, accompanied by a showing that SHP has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id*. (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty.  v. Brown*, 520 U.S. 397, 409 (1997) (brackets omitted)).

In her response, Rice proceeds under the second theory. This mode of proof is "available in a narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip employees with specific tools to handle recurring situations." *Id*. at 739 (internal quotations and brackets and citation omitted).  For example, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390 n.10 (citation omitted).

In such cases, the likelihood that a constitutional violation will occur "could lead to a finding that the policymaker's decision not to train reflects deliberate indifference" to the violation of that constitutional right. *Shadrick*, 805 F.3d at 739. Likewise, "[t]he high degree of predictability" may also support an inference that the policymaker's indifference caused the constitutional violation that was so predictable. *Id*. (citation omitted).

In *Shadrick*, the court determined that "a reasonable jury could find that the potential risk of the commission of constitutional torts by LPN nurses who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting is so obvious that [SHP]'s failure to provide adequate training and supervision to those nurses constitutes deliberate indifference to the risk." *Id*. at 739-40.

There, the evidence showed that SHP had no training program. *Id*. at 740. Here, to establish that SHP failed to train doctors and nurses to handle the recurring medical needs of inmates, Rice cites the violations of SHP policies and procedures by Waldridge and Tipton. In its reply, SHP does not allege that it had any training program at all.  Accordingly, as in *Shadrick*, Rice has submitted sufficient evidence to survive summary judgment that SHP's training program was inadequate. *Id*. at 741.

Further, as in *Shadrick*, SHP's medical professionals who are charged with administering medical care in jails "are routinely confronted with frequent and competing demands for medical care arising from the needs of numerous inmates suffering from maladies of varying severity." *Id*. at 740. It is predictable that placing medical professionals who have been inadequately trained to handle these situations in this setting "will lead to violation of the constitutional rights of inmates." *Id*. "A reasonable jury, therefore, could determine that SHP's failure to train and supervise its [medical professionals] in meeting their constitutional obligations demonstrates SHP's own deliberate indifference to the highly predictable consequence that [a professional] will commit a constitutional violation." *Id*. at 740.

While in *Shadrick*, the medical professionals involved were LPN nurses and here, the medical professionals are a doctor and an RN, it is nonetheless true in this case that, without specific training, the medical professionals "lack knowledge about the constitutional consequences of their actions or inaction in providing medical care to inmates." *Id*. at 742.

Further, in *Shadrick*, the court determined that "the conduct of SHP staff both before and after [the inmate's] death is relevant to whether SHP's failure to train and supervise its LPN nurses reflected a deliberate or conscious choice for which SHP may be held liable under § 1983." *Id*. at 743.  Here, there is no evidence that SHP's administrators took responsibility to train its medical staff to avoid constitutional violations. *Id*. at 742. Nor is there any evidence that, after Rice's death, SHP undertook an investigation, disciplined or counseled Dr. Waldridge or Tipton, or even interviewed them or visited the jail. While SHP questions Rice's evidence that there was no investigation after Gaunce's death, it cites no evidence that any such investigation occurred.

### 4) Constitutional claim against the county

As to the constitutional claim against the county, it can be held liable under § 1983 "only where its policy or custom causes the constitutional violation in question." *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005). It cannot be liable solely because an employee committed a constitutional violation. "While a municipality may be held liable under 42 U.S.C. § 1983 for a constitutional violation directly attributable to it, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir.1997).

In her reponse, Rice argues that the county had a "no-narcotics" policy that caused it to ignore Gaunce's legitimate need for narcotics medications that he had been lawfully prescribed. (DE 49, Response at 26.)  Rice does not allege that the policy is actually a written, formal policy. In cases, "where no formal policy exists, the critical question is whether there is a particular custom or practice that 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir.2007)).

Nurse Tipton testified that inmates on narcotics medication can continue to receive the medication in jail. (DE 44-4, Tipton Dep. at 65.) She testified that Dr. Waldridge decides on a case-by-case basis whether the inmate will continue to receive narcotics after Tipton verifies the prescription, the diagnosis, and any other pertinent medical information. (DE 44-4, Tipton Dep. at 65, 204.)

As evidence that the county has a blanket "no-narcotics" policy for inmates, Rice cites the deposition testimony of Lt. Crockett and Deputies Schultz and Garrison.  Lt. Crockett testified that he was not aware of any instance in which an inmate in the Montgomery County Jail was given narcotics whether prescribed or not. (DE 45-5, Crockett Dep. at 21.)

27

When asked whether inmates in the jail can get narcotics, Deputy Schultz testified "[f]ar as I know, no sir." (DE 45-4, Schultz Dep. at 62.) When asked the same question, Deputy Garrison testified, "[w]ell, I'm not the nurse. I really don't deal with that side of it. I've always heard that they're not allowed to have narcotics when they're in the facility so really that would be the nurse's responsibility at that point because I don't give meds anyway." (DE 45-3, Garrison Dep. at 82.) This is not sufficient evidence from which a jury could find a practice of denying inmates narcotics "so permanent and well settled as to constitute a custom or usage with the force of law."

Rice also argues that the jail had a policy of failing to comply with a Kentucky administrative regulation regarding the provision of medical services in jails which provides:

> A prisoner who has been prescribed treatment by a recognized medical authority and cannot receive that treatment in the jail shall be moved to another confinement facility that can provide the treatment or may be moved to a hospital.

501 KAR 3:090 (20).

Again, however, Rice does not allege that the county had a formal, written policy instructing jail personnel not to comply with the regulation. Rice cites no evidence from which a jury could find that this was a policy that was so permanent and well-settled that it had the "force of law." A jury could not infer such a policy based only on the fact that the jail did not immediately transfer Gaunce to a hospital to receive narcotics or from any evidence that jail personnel were not aware of the regulation.

Rice also argues that the county violated Gaunce's constitutional rights by failing to train its staff regarding the jail's EMS policy. Rice argues that there is sufficient evidence that the "county has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Bd. of Cnty. Comm'rs*, 520 U.S. at 409. She argues that the individual jail employees testified that they were unfamiliar with the jail's

EMS policy and had no training on the signs and symptoms indicating that a drug withdrawal had become serious or life threatening. Further, there is evidence that it is common for the jail to house inmates experiencing drug or alcohol withdrawal. (DE 45-4, Schultz Dep. at 73.) Thus, a violation of the inmates' rights to medical care was predictable.

Further, there is no evidence that the county investigated or employed any corrective actions after Gaunce's death. Based on this evidence, a reasonable jury could determine that the county's failure to train and supervise its jail personnel in meeting their constitutional obligations demonstrates the county's own deliberate indifference to the highly predictable consequence that a constitutional violation will occur.

Finally, Rice argues that the decisions by Dr. Waldridge and Nurse Tipton regarding Gaunce's medical care should be considered county policy for purposes of a § 1983 claim. Rice argues that such decisions constitute policy because the county had specifically delegated final decision-making authority regarding the medical treatment of inmates to SHP.  To prevail under this theory, Rice must produce evidence "from which a jury could reasonably conclude that [SHP] was vested with final authority to set medical treatment policy for the county's prisoners." *Johnson v. Hardin Cty., Ky.*, 908 F.2d 1280, 1286 (6th Cir. 1990). In *Johnson* the court held that evidence that a doctor made decisions regarding an inmate's treatment is not sufficient. Instead, in order to find the county liable for the medical decisions of SHP's personnel, the plaintiff was required to produce evidence that SHP "is vested with authority to make all of the county's medical *policy* decisions." *Id.* at 1287. Rice has presented no such evidence.  Accordingly, the county cannot be held liable for any deliberate indifference by SHP employees or agents.

### B. State law claims

#### 1) Claims against the county

Rice concedes that her state-law claims against the County must be dismissed because "Kentucky counties are cloaked with sovereign immunity." *Lexington-Fayette Urban County Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004). (DE 49, Response at 29 n.8.)

#### 2) Intentional Infliction of Emotional Distress

Rice states that she has no objection to the dismissal of her claim of intentional infliction of emotional distress against all of the defendants. (DE 50, Response at 37 n.12; DE 49, Response at 29 n. 8)

#### 3) Gross negligence

Rice asserts that the defendants were grossly negligent in caring for Gaunce. Under Kentucky law, gross negligence requires "first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety or property of others." *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389-90 (Ky.1985) (citation and internal quotations omitted). *See also City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001). This standard is somewhat less culpable than deliberate indifference. *Muskegon Cty.*, 625 F.3d at 947.

The defendants do not address this claim in their motions. Accordingly, this claim must remain.

#### 4) Negligence and negligence per se

The jail defendants argue that, even if they were negligent, they are entitled to qualified official immunity, which "affords protection . . . for good faith judgment calls made in a legally uncertain environment." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citation omitted). This doctrine recognizes that "[m]ost government officials are not expected to engage in 'the kind of legal scholarship normally associated with law professors and

30

academicians.'" *Id.* (citation omitted). It protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

"[P]ublic officers and employees are entitled to 'qualified official immunity' for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (i.e., were not made in 'bad faith'), and (3) were within the scope of the employee's authority. *Id.* at 475 (citation omitted). "Conversely, no immunity is afforded for the negligent performance or omissions of a ministerial act, or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive, i.e., again the 'bad faith' element." *Id.* at 475-76. "[O]nce the officer or employee has shown prima facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act [was in bad faith]." *Id.* (citation omitted).

"Discretionary duties involve the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Hedgepath v. Pelphrey*, 520 F. App'x 385, 389 (6th Cir. 2013) (quotations and citation omitted). "Discretion in the manner of the performance of an act arises when the act may be performed in one . . . or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Id.* (citation omitted). Ministerial duties, in contrast, require "only obedience to the orders of others, or when the officer's duty is absolute, certain and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citation omitted). Because few acts are purely discretionary or purely ministerial, the focus is on the dominant nature of the act. *Id.*

31

Thus, in determining whether the jail defendants are entitled to qualified immunity, the Court must first determine the actions that form the basis for Rice's negligence claims. For her negligence per se claim, Rice argues that the jail employees were negligent per se because they violated the Kentucky administrative regulation discussed above regarding medical treatment in jails. Again, that regulation provides:

> A prisoner who has been prescribed treatment by a recognized medical authority and cannot receive that treatment in the jail shall be moved to another confinement facility that can provide the treatment or may be moved to a hospital.

501 KAR 3:090(20).

Under the regulation, determining whether a prison must be moved to another confinement facility or a hospital is a factual determination. The regulation does not require that all prisoners be moved. Instead, jail personnel must determine issues like whether the treatment at issue has been prescribed by a "recognized medical authority," whether the prisoner can receive the treatment in the jail, whether another confinement facility can provide the treatment, and whether the prisoner should be moved to another facility or to a hospital. These are discretionary duties.

Accordingly, Rice must prove that the jail personnel acted in bad faith in deciding not to move Gaunce to another facility or hospital. She cites no evidence that any of these defendants "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Sloas*, 201 S.W.3d at 475. Accordingly, the jail personnel are entitled to qualified immunity on Rice's negligence per se claim.

As to Rice's negligence claim against the deputy jailers, she appears to base the claim on the deputies' alleged failure "to comply with the jail's EMS policy." (DE 49, Response at 33.) She argues that this is a ministerial duty. Again, that policy provides that seizure and drug withdrawal constitutes a medical emergency. (DE 49-6, Policy.) It further provides that a

detention officer confronted with those situations will perform certain functions: immediately administer first aid; "call the Facility Physician in accordance with the Medical Emergency Care Plan . . . and relay emergency information"; contact E.M.S.; and notify the Montgomery County Jailer. The plan further provides that the officer must comply with the Facility Physician's instructions to "contact ambulance" and "transport to St. Joseph Mt. Sterling Hospital." The Medical Emergency Care Plan instructs "First Aid must be given immediately" and "Telephone the Facility Physician for instructions." (DE 49-6, Policy.)

The act of determining whether an inmate is experiencing seizures or drug withdrawal may well be discretionary. Nevertheless, "[o]nce such a factual determination is made, it may trigger ministerial duties, such as notifying medical personnel or transporting the inmate to the hospital." *Sours v. Big Sandy Regional Jail Authority*, 946 F. Supp. 2d 678, (E.D. Ky. 2013), *overruled on other grounds by* 593 F. App'x 478 (6th Cir. 2014). In a case similar to this one, Judge McKinley found that jailers were not entitled to qualified immunity on a claim that they were negligent in violating the jail's EMS policy. This is because, "[o]nce it is determined that an inmate is experiencing a medical emergency, an officer is obligated to act in accordance with the EMS Policy, rendering his actions ministerial." *Finn v. Warren Cty., Ky.*, 2012 WL 3066586, at *25 (W.D. Ky. July 27, 2012), *overruled on other grounds by* 768 F.3d 441 (6th Cir. 2014).

Judge McKinley distinguished *Jerauld v. Kroger*, 353 S.W.3d 636 (Ky. App. 2011). In that case, the plaintiff argued that jail personnel were obligated to take specific acts once they determined that an inmate was at risk for suicide and, thus, their acts were ministerial. The court emphasized, however, that both personnel at issue did not believe the inmate was at risk for suicide. *Id*. at 640. Noting that deciding whether acts are discretionary or ministerial depends on the facts of each particular case, the court determined that the

33

decision regarding the inmate's suicide risk was discretionary and, therefore, the personnel at issue were entitled to qualified immunity. *Id*. at 641.

In *Finn*, Judge McKinley noted that, in contrast to *Jerauld*, the jailer defendants in that case had admitted they were aware that the defendant was experiencing alcohol withdrawal and, thus, their obligation to comply with the EMS policy was a ministerial duty. *Finn*, 2012 WL 3066586, at 25.

Here too, deputies Garrison and Schultz have both stated they were aware that Gaunce was withdrawing from narcotics, which is an "emergency" under the jail's EMS policy. Thus, their obligation to comply with the EMS policy was a ministerial duty. To the extent that Rice's negligence claim against the deputies is based on their failure to comply with that policy, they are not entitled to qualified official immunity. Further, there is sufficient evidence to withstand summary judgment that the deputies did not comply with the policy.

As to her negligence claim against Jailer Jones, Rice appears to base that claim on his alleged failure "to train on the EMS policy."  Rice argues that "training and supervision of employees to adhere to a written policy" is a ministerial duty. (DE 49, Response at 33-34.) This issue was decided by the Sixth Circuit in *Finn v. Warren County, Ky*., 768 F.3d 441 (6th Cir. 2014). There, the court determined that it is well settled that "although a supervisor's decision 'on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function.'" *Id*. at 449 (quoting *Hedgepath*, 520 F. App'x at 391).

Like in *Finn*, the Montgomery County Jail Policy and Procedures Manual provides that "All Detention Officers are trained to respond to medical emergencies since an inmate[']s[] life may depend on appropriate first aid. . . ."  (DE 49-6, Policy.) Jailer Jones is not entitled to qualified immunity on a claim that he "negligently performed his ministerial duties to train

34

the deputy jailers to follow the written EMS policy and to enforce the policy as written." *Id.* at 450.

The SHP defendants also argue that they are entitled to qualified official immunity on Rice's negligence claims. With regard to SHP itself, in *Shadrick*, the Sixth Circuit determined that qualified official immunity does not apply to it as a corporate entity. *Shadrick*, 805 F.3d at 744, 749. It protects only individual public officials or employees. As to Nurse Tipton and Dr. Waldridge, the Kentucky Court of Appeals has determined that "[s]ince SHP is a private corporation that was not created by the state of Kentucky, it does not, as a matter of law, have qualified immunity. If SHP does not have immunity, neither do the nurses it employs." *Sietsema v. Adams*, No. 2013-CA-001159, 2015 WL 4776304 (Ky. App. August 14, 2015). The court agrees with that analysis. Accordingly, SHP, Tipton and Dr. Waldridge are not entitled to qualified official immunity.

The SHP defendants also argue that the negligence per se claim fails because Rice has produced no expert testimony that they violated. KAR 501 3:090. They cite no authority for the argument that expert testimony is required for such a claim.

For these reasons, the negligence claims against SHP, Nurse Tipton, and Dr. Waldridge will not be dismissed.

### III. Conclusion

For all these reasons, the Court hereby ORDERS as follows:

    A.  The county defendants' motion for summary judgment (DE 42) is GRANTED in part and DENIED in part as follows:

        1)  the motion is GRANTED as to all claims against Justin Crockett and Larry Oakley and all claims against those defendants are DISMISSED;

2)  the motion is GRANTED as to the constitutional claim under 42 U.S.C. § 1983 against Avon Garrison and Jerry Schultz and those claims are DISMISSED;

3)  the motion is GRANTED as to the claim of intentional infliction of emotional distress and that claim is DISMISSED;

4)  the motion is GRANTED as to the claims of negligence, negligence per se, and gross negligence against the county and those claims are DISMISSED; and

5)  the motion is GRANTED as the claim of negligence per se against Eric Jones, Avon Garrison and Jerry Schultz and those claims are DISMISSED; and

B.  the SHP defendants' motion for summary judgment (DE 43) is GRANTED in part and DENIED in part as follows:

1)  the motion is GRANTED as to the claim of intentional emotional distress and that claim is DISMISSED; and

2)  the motion is otherwise DENIED.

Dated May 5, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY